53 Cal.App.4th 1139 (1997)
In re the Marriage of MIRIAM J. and JAMES HUGHES DRAKE.
JAMES R. ADAMOLI et al., Respondents,
v.
JAMES HUGHES DRAKE, Appellant.
Docket No. B099548.
Court of Appeals of California, Second District, Division Four.
March 27, 1997.
*1147 COUNSEL
Jeffrey W. Doeringer for Appellant.
*1148 Trope & Trope, Thomas Paine Dunlap and Bruce E. Cooperman for Respondents.
OPINION
BARON, J.
The record in this case depicts a millionaire father's resolute opposition to his former wife's petition for increased child support for their disabled adult son. Appellant James Hughes Drake challenges orders of the family court awarding child support, attorney fees, and sanctions. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND
Appellant James Hughes Drake (hereafter James) and Miriam J. Drake (hereafter Miriam) were married on November 6, 1945.[1] Their son, David James Drake (hereafter David), was born on November 8, 1950.
On March 23, 1960, an interlocutory judgment of divorce concerning James and Miriam's marriage was filed in Los Angeles Superior Court (No. D566797).) The final decree of divorce was entered on April 13, 1961.
In 1971, David was diagnosed as suffering from chronic schizophrenia, paranoid type. James retired in 1980 and remarried. Beginning in 1983, David lived with Miriam in Houston, Texas.
In 1983, Miriam created the David J. Drake 1983 Trust (hereafter the trust) to provide for David after her death. The residual beneficiaries of the trust were Miriam's nephews, James R. Adamoli and Mark A. Adamoli, who were also designated the trustees.
In 1988, David, through Miriam, his conservator, entered into a stipulated judgment with James in a civil case (Super. Ct. L.A. County, No. C644371). Under the terms of the judgment, James agreed to pay no less than $1,350 per month in child support and also to apply for Social Security retirement benefits, thereby enabling Miriam to seek federal disability benefits for David.
On April 28, 1995, Miriam filed an application for an order to show cause for modification of child support and for attorney fees and costs in their divorce case (No. D566797). Miriam's application sought guideline child support with "add-ons" pursuant to Family Code sections 4055, 4061, and 4062.
*1149 The application contained the following allegations: After the 1988 stipulated judgment, David continued to suffer from progressive schizophrenia that rendered him unable to care for himself, but Miriam had implemented a beneficial and cost-effective treatment program for David. In 1991, on the advice of David's psychiatrist, Miriam had moved out of the Houston townhouse owned by James Adamoli that Miriam and David had shared. Due to Miriam's worsening health, she could no longer tend David, and she had hired a live-in cook and housekeeper to replace her. In addition, James Adamoli, who had lived with Miriam and David, had moved out of the Houston townhouse and could no longer offer cost-free residence there to Miriam and David. These changes had increased the costs of David's care to $5,584 per month. In 1994, Miriam had paid 68 percent of these costs and James had paid 24 percent, although James's income was approximately twice as large as Miriam's income. Miriam requested that the court increase James's monthly child support payments to between $3,200 and $3,400, and require that James pay her attorney fees and costs.
On September 18, 1995, Miriam executed a will containing a "pour over" provision giving the substance of her estate to the trust. James and Mark Adamoli are the will's executors.
On October 23, 1995, Miriam filed an amended request for relief seeking, inter alia, a security order, and a separate hearing on the issue of attorney fees and costs.
On November 8, 1995, Miriam died. On November 21, 1995, James and Mark Adamoli applied for an order declaring them to be Miriam's successors in interest to her action for a modification of the child support order. James filed motions seeking to terminate the governing child support order and the proceedings to modify this order.
At hearings in December 1995, the trial court substituted James and Mark Adamoli as Miriam's successors in interest, denied James's motion to terminate Miriam's action, ruled that the Family Code guidelines apply in cases involving adult children, and bifurcated the issue of attorney fees. The trial court made findings based on the guidelines,[2] but reserved certain issues for later determination, including whether changes in James's child support obligations should be effective as of the date Miriam filed her application for a modification of the obligation. Finally, the trial court ordered James to pay *1150 a total of $3,715 in child support per month on an interim basis pending an assessment of the trust estate, as well as a $30,000 interim award of attorney fees. James appealed from the written orders following these rulings.
On April 5, 1996, the reserved issues concerning Miriam's petition came on for hearing. The trial court made findings pertinent to the guidelines,[3] and ordered James to pay a total of $3,670 per month in child support plus an arrearage for the period following May 1, 1995. The trial court also granted a security order requiring James to pledge securities worth $300,000 for David's benefit, and placing a lien on a parcel of real property owned by James. Finally, the trial court awarded the Adamolis another $10,000 in attorney fees.
James filed a motion for reconsideration of the security order. The Adamolis opposed this motion and requested $4,620 in sanctions.
On May 1, 1996, the trial court denied James's motion for reconsideration and sanctioned James. James appealed from these rulings and the written orders following the April 5 and May 1 hearings. James's two appeals were subsequently consolidated.

DISCUSSION
James contends that (1) the Adamolis were improperly deemed Miriam's successors in interest, (2) he has no obligation to support David, (3) the Family Code guidelines are inapplicable to cases involving adult children, (4) the trial court erred in calculating James's child support obligation under the guidelines, (5) the security order was an abuse of discretion, (6) the trial court improperly awarded attorney fees against James, (7) the trial court improperly awarded sanctions against James, (8) the retroactivity order was an abuse of discretion, and (9) the trial court improperly filed written orders prepared by the Adamolis that differed from its oral rulings.[4]
(1) "`[T]he trial court's determination to grant or deny a modification of a support order will ordinarily be upheld on appeal unless an abuse of *1151 discretion is demonstrated.' [Citation.] Reversal will be ordered only if prejudicial error is found after examining the record of the proceedings below. [Citation.] However, questions relating to the interpretation of statutes are matters of law for the reviewing court. [Citation.]" (County of Tulare v. Campbell (1996) 50 Cal. App.4th 847, 850 [57 Cal. Rptr.2d 902].)
To the extent James challenges the trial court's factual findings, our review follows established principles concerning the existence of substantial evidence in support of the findings. On review for substantial evidence, we examine the evidence in the light most favorable to the prevailing party and give that party the benefit of every reasonable inference. (In re Marriage of Catalano (1988) 204 Cal. App.3d 543, 548 [251 Cal. Rptr. 370].) We accept all evidence favorable to the prevailing party as true and discard contrary evidence. (Ibid.)

A. Successors in Interest

(2a) The threshold issues concern whether Miriam's action against James to modify the support order abated with her death, and if not, whether the Adamolis were appropriately deemed her successors in interest. (3) Absent certain exceptions, the only parties to a family law action are the husband and wife. (Cal. Rules of Court, rule 1211.) Nonetheless, in suitable circumstances, the court may substitute in place of a deceased spouse an appropriate representative of the deceased's estate. (In re Marriage of Allen (1992) 8 Cal. App.4th 1225, 1227-1228 [10 Cal. Rptr.2d 916]; Kinsler v. Superior Court (1981) 121 Cal. App.3d 808, 812 [175 Cal. Rptr. 564].)
When the family court expressly reserves jurisdiction over collateral issues such as property rights, spousal support, costs, and attorney fees after rendering judgment dissolving a marriage, the death of a spouse does not abate the action or remove the family court's jurisdiction to resolve these issues. (See In re Marriage of Allen, supra, 8 Cal. App.4th at pp. 1231-1235; see also In re Marriage of Hilke (1992) 4 Cal.4th 215, 220 [14 Cal. Rptr.2d 371, 841 P.2d 891].) In such cases, "the proper procedure is to substitute the personal representative of the deceased spouse's estate (or, if none, the spouse's successor in interest) as a party to the still-pending action ([Code Civ. Proc.,] §§ 377.31, 377.41), whereupon the reserved issues are properly decided under the Family Code." (Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 1996) ¶ 3:20, p. 3-8.)
(2b) No California court has addressed whether a successor in interest may step into the shoes of a custodial spouse when the custodial spouse *1152 seeks postjudgment modification of a child support order but dies prior to resolution of the matter. We begin by noting that the 1960 interlocutory judgment of divorce includes a term requiring James to pay $100 per month in child support throughout David's minority, and that the family court retains jurisdiction to modify such child support orders after entry of a marital status judgment. (See Hogoboom & King, Cal. Practice Guide: Family Law, supra, ¶ 17:2, p. 17-1.) Furthermore, "[a] pending action or proceeding does not abate by the death of a party if the cause of action survives" (Code Civ. Proc., § 377.21), and "[e]xcept as otherwise provided by statute, a cause of action for or against a person is not lost by reason of the person's death...." (Code Civ. Proc., § 377.20.)
No statute provides that Miriam's cause of action against James is lost by virtue of her death. Moreover, a parent's statutory duty to support an incapacitated adult child runs to the child (see Johnson v. Superior Court (1984) 159 Cal. App.3d 573, 582, fn. 3 [205 Cal. Rptr. 605]; Fam. Code, § 3910), although this duty may be enforced by an action initiated by the other parent (see Johnson v. Superior Court, supra, at p. 582; Fam. Code, § 4000.) Because James's duty is to David, James's duty of support did not expire with Miriam's death. (Cf. Chun v. Chun (1987) 190 Cal. App.3d 589, 597 [235 Cal. Rptr. 553] [parents' duty to support disabled adult child "is closely akin to a joint and several obligation"]); In re Marriage of Gregory (1991) 230 Cal. App.3d 112, 116-117 [281 Cal. Rptr. 188] [noncustodial parent's court-ordered duty to support minor child does not terminate when the custodial parent dies].) We therefore conclude that Miriam's action did not abate with her death.
The remaining issue is whether the Adamolis were properly deemed Miriam's successors in interest within the meaning of Code of Civil Procedure section 377.31, which provides that "[o]n motion after the death of a person who commenced an action or proceeding, the court shall allow a pending action or proceeding that does not abate to be continued by the decedent's personal representative or, if none, by the decedent's successor in interest." (Italics added.) For the purposes of section 377.31, "`decedent's successor in interest' means the beneficiary of the decedent's estate or other successor in interest who succeeds to a cause of action or to a particular item of the property that is the subject of a cause of action." (Code Civ. Proc., § 377.11.)
Here, Miriam's application sought child support from James sufficient to sustain the caring environment she had devised for David. Although Miriam brought her action in her own name, David, though not a party, was the real party in interest. (See County of Shasta v. Caruthers (1995) 31 Cal. App.4th *1153 1838, 1847-1849 [38 Cal. Rptr.2d 18]; Ruddock v. Ohls (1979) 91 Cal. App.3d 271, 281 [154 Cal. Rptr. 87] [interpreting prior law]; Everett v. Everett (1976) 57 Cal. App.3d 65, 69 [129 Cal. Rptr. 8] [same].)
The Adamolis were named the executors and beneficiaries of Miriam's will and, as trustees of the trust, were expressly charged with maintaining David's environment after her death, including taking necessary legal action to protect David's interests.[5] The terms of the trust clearly indicate that Miriam intended to create an instrument by which she could continue her parental care for David after her death. In view of these facts, we cannot conclude that the trial court erred in determining that the Adamolis were Miriam's appropriate successors in interest.
James contends that Miriam's action abated with her death, citing In re Marriage of Williams (1980) 101 Cal. App.3d 507 [161 Cal. Rptr. 808] and In re Marriage of Lisi (1995) 39 Cal. App.4th 1573 [46 Cal. Rptr.2d 623]. However, unlike the present case, the pertinent spouses in Williams and Lisi died before judgment of marriage dissolution. (See In re Marriage of Williams, supra, at p. 509; In re Marriage of Lisi, supra, at p. 1575.)
James also contends that the Adamolis could not be deemed Miriam's successors in interest until probate was completed. However, Code of Civil Procedure section 377.32 requires only that prospective successors certify that "[n]o proceeding is... pending in California for the administration of the decedent's estate," a claim that was true when the Adamolis sought to become Miriam's successors in interest. (Italics added.)
In sum, the trial court did not err in substituting the Adamolis in place of Miriam.

*1154 B. Duty to Support

(4a) James contends that he has no obligation to support David. In the case of a minor child, it is well established that "parents bear the primary obligation to support their child and... resort may be had to the child's own resources for his basic needs only if the parents are financially unable to fulfill that obligation themselves." (Armstrong v. Armstrong (1976) 15 Cal.3d 942, 947 [126 Cal. Rptr. 805, 544 P.2d 941]; see Hogoboom & King, Cal. Practice Guide: Family Law, supra, ¶ 6:411, p. 6-119.) (4b) However, no case has addressed whether under the current statutory scheme, income from a trust established by one parent to support a disabled adult child directly discharges the other parent's statutory support duty.
The key issue presented here is whether income from the trust directly discharges James's support obligation under Family Code section 3910, which provides: "The father and mother have an equal responsibility to maintain, to the extent of their ability, a child of whatever age who is incapacitated from earning a living and without sufficient means." Although no court has interpreted the term "without sufficient means," we observe that a parent's duty to support an adult child does not arise only when the child would otherwise be "`turned into the street'" (Chun v. Chun, supra, 190 Cal. App.3d at pp. 595-596), and that "[t]he duty to support children of any age is legislatively designed `to protect the public from the burden of supporting a person who has a parent ... able to support him or her.' [Citations.]" (In re Marriage of Lambe & Meehan (1995) 37 Cal. App.4th 388, 393 [44 Cal. Rptr.2d 641], quoting Chun v. Chun, supra, 190 Cal. App.3d at p. 594.) We therefore conclude that the question of "sufficient means" should be resolved in terms of the likelihood a child will become a public charge. (Cf. Chun v. Chun, supra, 190 Cal. App.3d at pp. 595-596 [Under preguideline law, that a mother fully supports a disabled adult child does not discharge the father's support duty in view of the statutory purpose "of preventing a disabled person in need from becoming a public charge. [Citation.]"].)
Here, the record discloses substantial evidence that David is incapacitated and "without sufficient means." There is no dispute that David cannot earn a living. Furthermore, although the evidence is in conflict, there is ample evidence that the trust will run dry long before David dies if the full burden of supporting David falls upon it, raising the prospect that David will become a public charge. Accordingly, the trial court properly concluded that *1155 David fell within the class of children protected by Family Code section 3910, and that James owed a duty to support David.[6]

C. Guidelines

(6a) James contends that the Family Code guidelines (Fam. Code, § 4050 et seq.) concerning child support are inapplicable in cases involving adult children. Here, the trial court determined James's total child support obligation pursuant to the guidelines by adding the results of two calculations. First, the trial court calculated James's basic support obligation by applying the guideline formula found in Family Code section 4055. Second, the trial court calculated James's share of responsibility for David's medical expenses and other add-on costs in accordance with Family Code sections 4061 and 4062. The focus of James's challenge is the guideline formula, although he contends that the guidelines as a whole cannot be applied to adult children.
The applicability of the guidelines to adult children is an issue of first impression. (7) "Absent persuasive precedent on the issue, resolution of the question presented requires this court to determine the Legislature's intent in enacting [the guidelines]. Our analysis follows `accepted rules for statutory construction, including the overriding objective of adherence to the intention of the Legislature [citation] and recognition of the principle that legislative intent is best determined by the language of the statute. [Citation.]" (County of Tulare v. Campbell, supra, 50 Cal. App.4th at p. 853.)
(6b) We observe that Family Code section 4050 expressly provides: "In adopting the statewide uniform guideline ..., it is the intention of the Legislature to ensure that this state remains in compliance with federal regulations for child support guidelines." The governing federal statutes accord each state the option of adopting guidelines and procedures that apply to adult children. (See 42 U.S.C. § 666(e).) Accordingly, the issue is whether the guidelines encompass adult children.
In our view, the express language of the pertinent Family Code sections resolves this question. With one exception, the Legislature uses the term *1156 "child," rather than "minor child," throughout these provisions.[7] Family Code section 58 expressly defines the term "`[c]hild for whom support may be ordered'" to cover a child falling under Family Code section 3910, that is, "a child of whatever age who is incapacitated from earning a living and without sufficient means." Subdivision (a) of Family Code section 4055, which describes the guideline formula, terms it "[t]he statewide uniform guideline for determining child support orders...." Section 4053 enumerates the principles the courts shall follow in implementing the guidelines, including the principle that "[t]he guideline is intended to be presumptively correct in all cases, and only under special circumstances should child support orders fall below the child support mandated by the guideline formula." (Fam. Code, § 4053, subd. (k).) Section 4057 provides that "[t]he amount of child support established by the formula provided in ... Section 4055 is presumed to be the correct amount of child support to be ordered," and that the presumption is rebutted only if the trial court finds by admissible evidence the presence of enumerated factors that render application of the formula "unjust or inappropriate in the particular case...." (Fam. Code, § 4057, subd. (b).) Finally, Family Code section 4074 provides broadly that "[t]his article applies to an award for the support of children, including those awards designated as `family support,' that contain provisions for the support of children as well as for the support of the spouse."
In enacting most of these provisions, the Legislature also enacted two related provisions that separately establish the duties of a parent to support, respectively, a "minor child" and "a child of whatever age who is incapacitated from earning a living and without sufficient means." (See Fam. Code, §§ 3900, 3910.)[8] We therefore infer that "the Legislature was fully aware of the need to differentiate between `minor' children or `adult' children ... where it intended to limit applicability of a particular provision to minor children on the one hand or adult children on the other," and we conclude *1157 that the Legislature's use of the unqualified word "child" here "must be deemed to have been a conscious, deliberate choice intended to refer to any child owed a duty of support by a parent." (Johnson v. Superior Court, supra, 159 Cal. App.3d at p. 584.)
James contends that Family Code section 3910 displaces the guidelines with respect to adult child support awards, citing the principle that specific statutes prevail over general statutes. We disagree. If James's reasoning is correct, section 3900, which establishes parental duties of support towards minors, would also displace the guidelines with respect to minor child support awards, rendering the guidelines redundant. We decline to interpret the statutory scheme in a manner that leads to absurd consequences. (County of Tulare v. Campbell, supra, 50 Cal. App.4th at p. 853.)
James also contends for several reasons that applying the guideline formula to adult children such as David leads to incongruous results.[9] The common theme of these contentions is that the guideline formula embodies assumptions true of minor children, but not of disabled adult children. Before addressing the details of these contentions, we address their general theme. We recognize that the situations of disabled adult children and their parents may often differ from those typical of minor children and their parents. Furthermore, as we explain below, the guideline formula embodies various assumptions about children and their parents, as well as the Legislature's intent that the benchmark for the amount of child support should be the parents' standard of living.
Nonetheless, we do not agree that the guidelines are fatally inflexible with respect to the special circumstances of disabled adult children and their parents. Generally speaking, when any assumption operating through the guideline formula produces an "unjust or inappropriate" result "due to special circumstances in the particular case," Family Code section 4057 "effectively vests trial courts with considerable discretion to approach unique cases on an ad hoc basis. [Citation.]" (County of Lake v. Antoni (1993) 18 Cal. App.4th 1102, 1106 [22 Cal. Rptr.2d 804]; see also Estevez v. Superior Court (1994) 22 Cal. App.4th 423, 430-431 [27 Cal. Rptr.2d 470].) *1158 We therefore conclude that the guidelines permit the trial court to adapt or depart from the formula when warranted by the special circumstances of particular disabled adult children or their parents.
(8a) James's first contention is that the guideline formula does not properly take into account the fact that adult children often have sources of support independent of their parents. He contends that the trust income should directly discharge or offset any support duty he has, citing Levy v. Levy (1966) 245 Cal. App.2d 341 [53 Cal. Rptr. 790] and Lakenan v. Lakenan (1967) 256 Cal. App.2d 615 [64 Cal. Rptr. 166].
The general concern raised here is not persuasive. (9) We are aware that under the guideline formula the child's own estate, as such, is not a factor in computing the amount of child support owed by a parent. (Hogoboom & King, Cal. Practice Guide: Family Law, supra, ¶ 6:411, p. 6-119.) This feature of the formula reflects "the legislative intent that children [should] share in the standard of living of both of their parents" (Fam. Code, § 4054, subd. (g); see Estevez v. Superior Court, supra, 22 Cal. App.4th at p. 428), and the principle that "[a] parent's first and principal obligation is to support his or her minor children according to the parent's circumstances and station in life" (Fam. Code, § 4053, subd. (a)). Nonetheless, in suitable circumstances, the trial court may adjust parental support obligations in light of a child's independent income. (See Hogoboom & King, supra, ¶¶ 6:411 to 6:415, pp. 6-119 to 6-120.) (8b) Accordingly, when a disabled adult child has independent income or assets, the trial court has the discretion to reduce the formula-calculated amount of child support.
In the context of this case, we do not discern any error in the manner in which the trial court used the trust income in the guideline formula. The trial court treated the trust as if it were one of David's parents in the formula calculation, rather than as an independent source of income available to David. In our view, this treatment was warranted by David's special circumstances. Here, Miriam's evident intention was that the trust should continue in her place after her death as a form of surrogate mother. The terms of the trust specifically directed the Adamolis to use the trust income to preserve and maintain the environment of care Miriam had designed and implemented for David before her death.[10] The record discloses ample evidence that James Adamoli had been personally supervising David's care in a manner similar to Miriam.
Nor was the result unfair or inappropriate. On the basis of the resulting calculations, the trial court ordered James to pay $3,715 in child support per *1159 month on an interim basis, and later, $3,670 per month plus an arrearage. These monthly sums constitute between 66 and 70 percent of David's present monthly expenses, which the record indicates are $5,584 per month. The record also indicates that James's share of these expenses is roughly equivalent to James's share of the total net income jointly available to James and the trust (before support).
Levy and Lakenan, which predate the current statutory scheme, do not disturb our conclusion on this matter. In Levy, the court held that the trial court could assess income to a disabled adult child from all sources, including the child's own estate, in determining the father's child support obligation. (Levy v. Levy, supra, 245 Cal. App.2d at pp. 355, 358.) Here, the trial court properly applied the holding in Levy, to the extent it remains viable under the current statutory scheme. In applying the guideline formula, the trial court assessed the income available to David from all sources.
In Lakenan, the court held that the trial court did not abuse its discretion in applying income to a minor child flowing from trusts established by a grandparent and an aunt as an offset against a parent's duty of support. (Lakenan v. Lakenan, supra, 256 Cal. App.2d at pp. 621-623.) As we have explained, the trial court did not err in the circumstances of this case in assigning the trust income to the Adamolis' side of the guideline formula, rather than using it as a direct offset against James's support obligation. We find no abuse of discretion here.
(10) James's second contention is that the guideline formula does not respect the terms of Family Code section 3910 because the formula does not take the totality of a parent's financial situation into account. Whereas Family Code section 3900 imposes a duty on parents of a minor child "to support their child in the manner suitable to the child's circumstances," section 3910 imposes a duty on parents of an adult child "to maintain[] [the child] to the extent of their ability...." James argues that determination of a parent's ability to pay adult child support requires an assessment of the totality of his or her financial circumstances, citing preguideline case authority concerning minor and adult children.
Again we cannot agree. The present statutory scheme limits the broad discretion accorded the trial court under prior law and channels its remaining discretion within the new statutory parameters. (See In re Marriage of Carter (1994) 26 Cal. App.4th 1024, 1028 [33 Cal. Rptr.2d 1].) With respect to the question concerning ability to pay, section 4053 states that in implementing the guidelines, the courts should adhere to the principle that "[e]ach parent should pay for the support of the children according to his or her ability," *1160 without distinguishing between minor children and disabled adult children. (Fam. Code, § 4053, subd. (d), italics added.) In view of section 4053 and the sweeping statutory language concerning the presumptive applicability of the guideline formula, we conclude that the Legislature has incorporated the appropriate assessment of ability to pay within the guidelines. As we have explained, the guidelines include an escape clause when this assessment produces an unfair or inappropriate result. No such result was presented here.
(8c) James's third contention is that the guideline formula is inapplicable to disabled adult children because it incorporates "time-sharing" as a factor, although many disabled adult children, including David, are not in the custody of either parent. Again, we do not find any fatal inflexibility in the guideline formula concerning adjustments appropriate for cases involving children not under the supervision of either parent. (See Welf. & Inst. Code, § 11350, subd. (c).)
Moreover, in the circumstances of this case, the trial court did not err in according Miriam and her successors in interest credit for full physical responsibility for David under the guideline formula. "The time-sharing adjustment is based on the parents' respective periods of primary physical `responsibility' for the children rather than physical `custody.' Use of this terminology is purposeful: i.e., to clarify that [section] 4050 et seq. is not intended to alter current child custody law in any manner." (Hogoboom & King, Cal. Practice Guide: Family Law, supra, ¶ 6:168, p. 6-52.) The record here discloses substantial evidence that Miriam and her successors in interest have had full responsibility for David's physical situation and care, that James has no physical responsibility for David, and that James visited David only three times between May 1988 and June 1995.
James's fourth contention is that application of the guideline formula to disabled adult children precludes the trial court from issuing child support orders binding on both parents, in contravention of Chun v. Chun, supra, 190 Cal. App.3d 589. In Chun, a preguideline case, the court held that the trial court should have ordered both parents to pay support for their disabled adult child, reasoning that the statutory support duty was imposed on both parents and the defendant father had cross-complained for a mutual order. (See id. at pp. 592, 597-598.) James attributes the trial court's failure to issue a mutual support order to its application of the guideline formula.
We are not persuaded that Chun poses an issue limited to disabled adult children. Under the present statutory scheme, the issue concerning mutual support orders arises for the duties of support imposed under Family Code *1161 sections 3900 and 3910. These sections state that parents have an "equal responsibility" concerning, respectively, their minor and disabled adult children. Furthermore, Family Code section 3901 expressly states that the duty imposed under section 3900 continues with respect to certain children who have attained the age of 18 (see Fam. Code, § 3901, subd. (a)), and Family Code section 4001, which applies to actions arising under sections 3901 and 3910, provides that "... the court may order either or both parents to pay an amount necessary for the support of the child." (Italics added.) However, the guideline formula calculates a single sum owed by one parent to the other. (See Hogoboom & King, Cal. Practice Guide: Family Law, supra, ¶ 6:177, p. 6-55.) Thus, sections 3900 and 3901, like section 3910, impose support duties on both parents, but the formula does not place a monetary figure on each parents' support duty.
However, it is unnecessary for us to address this issue or the extent to which the current statutory scheme may abrogate the holding in Chun. Unlike the father in Chun, James did not file a petition for an order against Miriam or the Adamolis. Accordingly, the trial court did not err in failing to make such an order.[11]
James's final contentions strike a different theme, namely, that applying the guidelines was inequitable due to circumstances other than David's status as a disabled adult child. He contends that (1) the guideline-calculated support amount is too high due to James's "extraordinarily high income" (Fam. Code, § 4057, subd. (b)(3)), (2) the guideline calculations did not take into account that David's living expenses are lower in Texas, and (3) the guideline calculations did not take into account James's significant living expenses attributable to his new spouse.
These contentions do not disturb our conclusion that the trial court properly applied the guidelines. With respect to item (1), as we have *1162 explained, the guideline formula did not produce an unjust or inappropriate result. Finally, on the record before us, we conclude that items (2) and (3) are meritless. (See Fam. Code, § 4804 [Providing in pertinent part that "[d]uties of support arising under the law of this state ... bind the obligor, present in this state, regardless of the presence or residence of the obligee."]; Haggard v. Haggard (1995) 38 Cal. App.4th 1566, 1572 [45 Cal. Rptr.2d 638] [absent special circumstances, financial obligations due to new marriage do not rebut presumptive applicability of guideline formula].)
In sum, the trial court did not err in determining that the guidelines and guideline formula were applicable in the present case.

D. Guideline Factors

(11) James contends that in applying the guidelines, the trial court erred in (1) failing to give him a direct credit for the Social Security disability benefits paid to David, and (2) using his present wife's income figures in the guideline calculation.
With respect to item (1), the trial court charged the monthly disability benefits of $474 to the Adamolis' side of the guideline formula, indirectly reducing James's support obligation, rather than directly crediting these benefits as part of James's support payments. James does not dispute that the trial court's use of the disability benefits reduced his formula-calculated support duty from what it would have been had the benefits been disregarded altogether, but he contends that he was entitled to a greater reduction obtainable through a direct credit for these benefits.
The issue presented concerns Family Code section 4504, which provides that federal disability benefits arising from a noncustodial parent's retirement are credited against the noncustodial parent's child support obligations "unless the payments made by the federal government were taken into consideration by the court in determining the amount of support to be paid by the noncustodial parent." (Italics added.) No case authority has addressed when the trial court may take federal benefits into account when determining child support, in lieu of extending a direct credit for these benefits. However, because "[s]tatutes are to be interpreted to give significance to every word contained therein" (County of Tulare v. Campbell, supra, 50 Cal. App.4th at p. 853), we conclude that the matter is consigned to the trial court's sound discretion.
Here, the trial court charged the benefits to the Adamolis' side of the guideline formula in the course of making other adjustments to that side of *1163 the formula favorable to James, including increasing the trust's income figures by a sum equal to Miriam's living expenses (as if she were still alive). Furthermore, we observe that under the terms of the 1988 stipulated judgment, Miriam assumed the responsibility of applying for federal disability benefits for David's benefit. On this record, we cannot conclude that the trial court abused its discretion.
With respect to item (2), the record discloses that the trial court took the income of James's present wife into account only for the purpose of facilitating an income tax computation. This use of the income figure was proper. (See In re Marriage of Carlsen (1996) 50 Cal. App.4th 212, 218-219 [57 Cal. Rptr.2d 630]; County of Tulare v. Campbell, supra, 50 Cal. App.4th at pp. 854-856.)

E. Security Order

(12a) James contends that the trial court abused its discretion in issuing the security order. Family Code section 4012 provides that "[u]pon a showing of good cause, the court may order a parent required to make a payment of child support to give reasonable security for the payment."
Here, the trial court found that (1) the court-ordered support was a charge upon James's estate, (2) David had an actuarial life expectancy of 37 years, (3) James had transferred some of his separate property to his present wife, and (4) James's transfers "reduces or minimizes his separate estate available to support [David] should [James] predecease his adult disabled child." Accordingly, the trial court granted a security order requiring James to pledge securities worth $300,000 for David's benefit, and placing a lien on a parcel of real property owned by James. The order states that James "shall be free to trade, invest, and reinvest within said segregated separate account, and shall be entitled to receive and utilize all interest and dividends produced thereby for his own purposes."
The key legal issue presented here is whether the court-ordered child support is a charge upon James's estate. Family Code section 4007 provides: "If a court orders a person to make specified payments for support of a child during the child's minority, or until the child is married or otherwise emancipated, or until the death of, or the occurrence of a specified event as to, a child for whom support is authorized under Section 3901 or 3910, the obligation of the person ordered to pay support terminates on the happening of the contingency." (Fam. Code, § 4007, subd. (a).)
No court has interpreted this statute in the context of court-ordered support for disabled adult children. However, in cases involving minor *1164 children, it is settled that, absent the occurrence of a support-ending contingency cited in the pertinent child support order, such "support survives the death of the noncustodial parent and becomes a charge on his or her estate. [Citations.]" (See In re Marriage of Gregory, supra, 230 Cal. App.3d at p. 115.) Accordingly, we conclude that the support order will be a liability against James's estate.
James does not dispute that substantial evidence supports the trial court's findings concerning James's transfers of real property to his present wife and David's life expectancy. There is also no dispute that James was 71 years old when the trial court issued the security order. Furthermore, we observe that the trial court crafted its order so as to limit its effect on James's income stream. On this record, we do not discern an abuse of discretion with respect to the security order. (See Franklin Life Ins. Co. v. Kitchens (1967) 249 Cal. App.2d 623, 627-632 [57 Cal. Rptr. 652]; Baylis v. Baylis (1941) 48 Cal. App.2d 674, 679-680 [120 P.2d 89].)
James challenges the trial court's ruling on many grounds. First, James contends the security order was unwarranted because James had a history of paying his court-ordered child support payments on time. Here, the trial court found "good cause" for the security order in James's property transfers that reduced the prospect his estate could pay his support obligations after his death. The issue thus presented concerns the interpretation of the term "good cause" within the meaning of Family Code section 4012.
There is little case law on Family Code section 4012. However, in Franklin Life Ins. Co. v. Kitchens, supra, 249 Cal. App.2d 623, the court concluded that an ancestor of this provision authorized the trial court to order a father to secure child support payments by carrying a life insurance policy, reasoning that the father's obligation was a charge against his estate and that he had little property to satisfy this obligation once he died. (See id. at pp. 627-632.) Furthermore, we note that in Baylis v. Baylis, supra, 48 Cal. App.2d 674, the court affirmed the trial court's imposition of a lien on a father's real property to secure child support payment, although there is no indication the father was derelict in making these payments. (See id. at pp. 678, 679-680.) We therefore conclude that concerns about the ability of a parent's estate to pay child support following the parent's death may constitute "good cause" to issue a security order.
To the extent James's contention challenges the factual basis for the security order, it fails. "Where the issue on appeal is whether the trial court has abused its discretion, the showing necessary to reverse the trial court is insufficient if it presents facts which merely afford an opportunity for a *1165 different opinion...." (Winick Corp. v. County Sanitation District No. 2 (1986) 185 Cal. App.3d 1170, 1176 [230 Cal. Rptr. 289].)
Second, James contends that the security order was an impermissible attempt to enforce James's promise to provide for David in his will prior to James's death, citing In re Marriage of Edwards (1995) 38 Cal. App.4th 456 [45 Cal. Rptr.2d 138]. The 1960 interlocutory judgment of divorce contains a term requiring James to "execute a Last Will and Testament which will provide that [David] ... shall receive from [James] by way of devise or legacy upon [James's] death property from [James], or over which [James] has a power of appointment, having a value at least equal to that received by any other devisee or legatee described in said Last Will and Testament."
The trial court's security order states that it was aware of Edwards and that the order does not rest on James's promise concerning his will. Upon review, we conclude that the security order does not contravene our decision in Edwards. In Edwards, we held that a contract to make a will cannot be specifically enforced before the promisor's death. (See 38 Cal. App.4th at pp. 460-462.) By contrast, the security order does not direct James to include any specific terms in his will, but ensures instead that James's estate will have some assets to meet his court-ordered child support obligation following his death. As we have explained, this obligation survives James's death. When James dies, his estate will be liable for accrued amounts of child support then owing, and it must continue to pay child support absent a modification of the court order due to changed circumstances. (See In re Marriage of Bertrand (1995) 33 Cal. App.4th 437, 439-440 [39 Cal. Rptr.2d 151].)
(13) Third, James contends that security orders under section 4012 are governed and limited by Family Code section 4550 et seq., which permits the trial court to order that advance deposits of child support be made up to a maximum of $6,000. (See Fam. Code, §§ 4560, 4604, 4614.) We do not agree. Taylor v. Superior Court (1990) 218 Cal. App.3d 1185, 1188-1190 [267 Cal. Rptr. 519], concluded that the procedures for securing child support by lien and by deposit are distinct.
(12b) Fourth, James contends that the security order improperly imposes a conservatorship on his assets without a hearing, citing In re Marriage of Johnson (1982) 134 Cal. App.3d 148 [184 Cal. Rptr. 444]. Again, we cannot agree. In Johnson, the court concluded the trial court erred in imposing a lien of indefinite duration on the entirety of the father's share of the community property due to the father's drinking problem. (See id. at pp. 161-162.) The Johnson court found persuasive the father's contention that the lien effectively deprived him of any ability to acquire new property or start a new business. (See ibid.)
*1166 By contrast, the terms of the security order here have a limited effect on James's ability to invest and derive income from the pertinent assets. Moreover, when the court ruled, it had before it evidence that James's assets were valued at approximately $1.5 million, including approximately $790,000 in real and personal property. Thus, there was evidence the award concerned no more than 73 percent of James's assets, and probably less.[12]
Fifth, James contends that the security order is an impermissible restraint on alienation under Civil Code section 711, which provides that "[c]onditions restraining alienation, when repugnant to the interest created, are void." However, section 711 has no application to "disabling restraints established by express statute...." (4 Witkin, Summary of Cal. Law (9th ed. 1987) Real Property, § 405, p. 593.)
Finally, James contends in conclusory terms that the security order violates his rights to due process and to equal protection of the laws. On this record, we do not discern unfairness, deprivation of procedural rights, or unequal application of the law that rises to a constitutional injury.
In sum, the trial court did not err in issuing the security order.

F. Attorney Fees

(14a) James contends that the trial court erred in awarding Miriam and her successors in interest their attorney fees. Family Code section 2030 provides: "For services rendered or costs incurred after entry of judgment, the court may award the attorney's fees and costs reasonably necessary to maintain or defend any subsequent proceeding, and may augment or modify an award so made, including after an appeal has been concluded." (Fam. Code, § 2030, subd. (c).)
(15) Awards of attorney fees are reviewed for abuse of discretion. (See In re Marriage of Ananeh-Firempong (1990) 219 Cal. App.3d 272, 279-280 [268 Cal. Rptr. 83].) Guidance concerning the use of the trial court's discretion is found in Family Code section 2032, which provides in pertinent part: "(a) The court may make an award of attorney's fees and costs under Section 2030 ... where the making of the award, and the amount of the award, are just and reasonable under the relative circumstances of the respective parties. [¶] (b) In determining what is just and reasonable under the relative circumstances, the court shall take into consideration the need for the award to *1167 enable each party, to the extent practical, to have sufficient financial resources to present the party's case adequately.... The fact that the party requesting an award of attorney's fees and costs has resources from which the party could pay the party's own attorney's fees and costs is not itself a bar to an order that the other party pay part or all of the fees and costs requested. Financial resources are only one factor for the court to consider in determining how to apportion the overall cost of the litigation equitably between the parties under their relative circumstances."
In view of Family Code section 2032, "[a] disparity in the parties' respective circumstances may itself demonstrate relative `need' even though the applicant spouse admittedly has the funds to pay his or her fees." (Hogoboom & King, Cal. Practice Guide: Family Law, supra, ¶ 14:159, p. 14-35, original italics.) In assessing one party's relative "need" and the other party's ability to pay, the court may consider all evidence concerning the parties' current incomes, assets, and abilities, including investment and income-producing properties. (See id. at ¶ 14:160.) Furthermore, in determining whether to award attorney fees to one party, the court may also consider the other party's trial tactics. (See In re Marriage of Dick (1993) 15 Cal. App.4th 144, 166-168 [18 Cal. Rptr.2d 743] [$750,000 award affirmed under predecessor of section 2032 because the record "reveals a case of stunning complexity, occasioned, for the most part, by husband's intransigence"].)
(14b) During the December 1995 hearings, the Adamolis requested an interim attorney fee award of at least $35,000.[13] The trial court awarded the Adamolis a $30,000 interim award of attorney fees "without prejudice [and] subject to redecision and correction" upon the Adamolis' representation that Miriam's assets were then inaccessible. On April 5, 1996, the issue of attorney fees came on for hearing and final resolution. The Adamolis requested an additional award of $45,000 pursuant to Family Code sections 2030 and 271.[14] The trial court determined that the prior award was proper, and that the Adamolis were entitled to another $10,000 in attorney fees under section 2030 in view of "the needs and abilities of both of the parties and the disparity between the estates, both [sic] income and the larger picture of total assets."
*1168 The trial court's conclusion concerning James's assets and income is supported by substantial evidence. The record discloses that James's assets and monthly gross income are, respectively, $1.5 million and $15,353, whereas after payment of estate taxes, the trust's assets and monthly gross income are, respectively, $925,000 and $5,985.
In sum, the trial court did not abuse its discretion in awarding attorney fees.

G. Sanctions

(16) James contends that the trial court erred in awarding sanctions after denying his motion for reconsideration. Under Code of Civil Procedure section 1008, a party seeking reconsideration of a prior ruling upon an alleged different set of facts must "provide both newly discovered evidence and an explanation for the failure to have produced such evidence earlier. [Citation.]" (Robbins v. Los Angeles Unified School Dist. (1992) 3 Cal. App.4th 313, 317 [4 Cal. Rptr.2d 649].) Subdivision (d) of section 1008 provides that "[a] violation of this section may be punished ... with sanctions as allowed by Section 128.5." An action or tactic is subject to sanctions under Code of Civil Procedure section 128.5 only if it is in bad faith and is frivolous or solely intended to cause unnecessary delay. (Dolan v. Buena Engineers, Inc. (1994) 24 Cal. App.4th 1500, 1505-1507 [29 Cal. Rptr.2d 903].) Sanction awards are reviewed for abuse of discretion. (See Winick Corp. v. County Sanitation District No. 2, supra, 185 Cal. App.3d at p. 1176.)
Here, the trial court awarded sanctions, finding that "... [James's] action of filing a Motion for Reconsideration ... without showing new or different facts, and without providing any explanation for not having earlier produced the facts proffered... constitutes a bad faith tactic which was totally and completely without merit and frivolous within the meaning of [Code of Civil Procedure section 128.5]." The record discloses that James filed his motion one week after the hearing on the security order, alleging as a different set of facts that the security order concerned approximately one-half of his assets. He submitted a declaration from a real estate broker that the affected real property was worth $440,000.
On the record before us, we do not discern an abuse of discretion. No credible explanation was offered concerning James's failure to obtain this evidence earlier. Moreover, because the trial court had before it evidence that the security order touched no more than 73 percent of James's assets when it issued the security order (see pt. E., ante), the purported newly *1169 discovered facts were not material to a reconsideration of the ruling. When an action utterly lacks merit, the trial court is entitled to infer that the action was taken in bad faith. (Dolan v. Buena Engineers, Inc., supra, 24 Cal. App.4th at p. 1505.)
James contends that the sanctions award was improper because section 128.5 is applicable only to "actions or tactics [that] arise from a complaint filed, or a proceeding initiated, on or before December 31, 1994" (Code Civ. Proc., § 128.5, subd. (b)(1)), and Miriam's petition was filed in April 1995. However, because the underlying divorce action here was filed in 1960 or earlier, the sanctions award was not barred by the section 128.5 time limit.
In sum, the trial court did not abuse its discretion in awarding attorney fees.

H. Retroactivity Order

(17) James contends in conclusory terms that the trial court erred in ordering him to pay an arrearage for the period following the filing of Miriam's petition. Family Code section 4009 provides in pertinent part that "[a]n order for child support may be made retroactive to the date of filing the notice of motion or order to show cause...." We observe that Miriam's petition alleges that as of the date of the petition, she was bearing a disproportionately large share of David's expenses, and the record contains substantial evidence to support this allegation. David's care cost $5,584 per month, of which Miriam had paid approximately 68 percent, even though James's income was approximately twice as large as Miriam's income. Accordingly, we conclude that the retroactivity order was not an abuse of discretion.

I. Written Orders

(18a) Finally, James contends that three of the trial court's written orders on the aforementioned matters are infirm because they differ from the trial court's oral rulings. Following the trial court's rulings at the hearings in December 1995, April 1996, and May 1996, the Adamolis prepared written orders to which James objected. The trial court held hearings on James's objections to the first two proposed orders and filed them, with some modifications. James did not request a hearing on his objections to the third proposed order, which the trial court filed as prepared.
The crux of James's contention is that the trial court improperly allowed the Adamolis to modify the trial court's original rulings. Our analysis of this *1170 contention follows established principles. (19) A trial court's oral ruling on a motion does not become effective until it is filed in writing with the clerk or entered in the minutes. (Pacific Home v. County of Los Angeles (1953) 41 Cal.2d 855, 857 [264 P.2d 544]; Ketscher v. Superior Court (1970) 9 Cal. App.3d 601, 604 [88 Cal. Rptr. 357]; see 7 Witkin, Cal. Procedure, supra, Judgment, § 51, pp. 488-489; id. § 56, pp. 492-493.) Accordingly, the trial court may properly file a written order differing from its oral rulings when the rulings have not been entered in the minutes of the court. (See Miller v. Stein (1956) 145 Cal. App.2d 381, 385 [302 P.2d 403].) Furthermore, when the trial court's minute order expressly indicates that a written order will be filed, only the written order is the effective order. (See 7 Witkin, supra, § 56, pp. 492-493; Cal. Rules of Court, rule 2(b).)
(18b) Nothing in the record before us shows that the trial court's oral rulings became effective before the relevant written orders were filed. The record does not disclose that the trial court's oral rulings following the December hearings were entered by minute order. Moreover, the minute orders for the April and May hearings direct the Adamolis to prepare written orders.
Because only the written orders were effective, the trial court did not err in filing written orders that differed from its earlier oral rulings.

DISPOSITION
The trial court's orders are affirmed. Respondents are to recover their costs.
Vogel (C.S.), P.J., and Hastings, J., concurred.
On April 18, 1997, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied June 11, 1997.
NOTES
[1] Because the key parties share a surname, we refer to them by their proper names.
[2] The trial court found that James's gross income was approximately $15,000 per month, applied the trust income to the Adamolis' side of the guideline calculation, and determined that James's basic support obligation was $1,924. In addition, the trial court also found that David's add-on expenses for medical care and treatment totalled $3,582 per month, which it allocated equally between James and the trust.
[3] At this hearing, the trial court again applied the trust's income to the Adamolis' side of the guideline calculation. The trial court found that James's basic child support obligation was $1,879 per month, and that he was responsible for add-on expenses of $1,791 per month.
[4] We observe that James also contends the trial court erred in resolving the matters before it on the basis of declarations rather than on the basis of oral testimony. Section 2009 of the Code of Civil Procedure accords trial courts discretion to determine an order to show cause upon declarations alone, and to exclude or admit oral testimony. (See Reifler v. Superior Court (1974) 39 Cal. App.3d 479, 483-485 [114 Cal. Rptr. 356].) Because James did not object to this procedure before the trial court, he has waived this contention of error. (See 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, §§ 305-310, pp. 316-321.)
[5] Miriam modified the terms of the trust on November 3, 1995, just prior to her death. The amended trust instrument provides that following Miriam's death, "the Trustee ... shall pay to or apply for the benefit of [Miriam's] son, [David], as much of the income and principal of the Trust as the Trustee, in the Trustee's discretion, considers necessary for his proper support, care, maintenance, health, and education. The Trustee may also pay or apply income or principal for reasonable legal fees and expenses to pursue any legal action or actions deemed necessary or advisable for the benefit of [David]. Any income of the Trust that is not distributed ... shall be accumulated and added to the principal." Furthermore, the modified terms provide that "[i]t is the direction of [Miriam] that, for so long as is reasonably possible, [David] shall be maintained in a living environment the same as or similar to the environment that [Miriam] has provided for him, to wit: his living in a private dwelling place under constant supervision by competent companions." Finally, the amended terms state that "[i]n making payment or application of principal or income to or for [David], the Trustee shall take into consideration any other resources available to [David], in addition to the income and principal of the Trust Estate, including the resources of [James]...."
[6] We observe that this evidence was not before the trial court when it ordered interim child support. Nonetheless, the trial court received this evidence prior to its final ruling on child support. Because the trial court properly awarded child support retroactively (see pt. I., post) and credited James's interim child support payments against this arrearage, we conclude that any error here was not prejudicial.
[7] In section 4053, the Legislature enumerated a set of principles "the courts shall adhere to" "[i]n implementing the statewide uniform guideline...." All but one principle is couched in terms of the unqualified term "children." The exception is that "[a] parent's first and principal obligation is to support his or her minor children according to the parent's circumstances and station in life." (See Fam. Code, § 4053, subd. (a).)
[8] Family Code section 3900 provides that "... the father and mother of a minor child have an equal responsibility to support their child in the manner suitable to the child's circumstances."

Family Code sections 3900 and 3910 were enacted in their present form in 1992, along with the precursors of Family Code sections 4050, 4053, 4055, and 4057. (See Stats. 1992, ch. 162, § 10.) However, the precursors of the latter sections failed to become operative because they were replaced before their operative date by amended successor provisions. (See Stats. 1993, ch. 219, § 137; Stats. 1993, ch. 1156, §§ 1-8; Stats. 1993, ch. 935, §§ 1-4.) The pertinent amendments did not involve the term "child." Family Code sections 58 and 4074 were enacted during the same session as the present versions (absent minor amendments) of sections 4050, 4055, and 4057. (See Stats. 1993, ch. 219, § 79; id. § 138.)
[9] The guideline formula is as follows: "CS = K [HN - (H%) (TN)]." (Fam. Code, § 4055, subd. (a).) The variables here are defined as follows:

"(A) CS = child support amount.
"(B) K = amount of both parents' income to be allocated for child support....
"(C) HN = high earner's net monthly disposable income.
"(D) H% = approximate percentage of time that the high earner has or will have primary physical responsibility for the children compared to the other parent....
"(E) TN = total net monthly disposable income of both parties." (Fam. Code, § 4055, subd. (b)(1).)
[10] See footnote 5, ante.
[11] James also contends that adult children fall outside the guidelines, citing In re Marriage of Cooper (1985) 170 Cal. App.3d 883 [216 Cal. Rptr. 611]. In Cooper, a disabled adult child who lived with his mother in the family home tried to enjoin sale of the home following his parents' divorce under former Civil Code section 4800.7, which permitted a temporary award of the family home to the divorced spouse having custody of a minor child. (See 170 Cal. App.3d at pp. 884-885.) The court held the statute was inapplicable to an adult child, citing the language of the statute and the proposition that "[t]here is a rational basis for distinguishing between an incapacitated adult child and a well minor child." (Id. at p. 886.)

Respondents have requested that we take judicial notice of legislative history indicating that following the ruling in Cooper, the Legislature amended section 4800.7 (now Fam. Code, § 3800) to permit temporary home awards in cases involving disabled adult children. We hereby do so. (See Evid. Code, § 459; Diamond View Limited v. Herz (1986) 180 Cal. App.3d 612, 619 [225 Cal. Rptr. 651].) Upon review, we find that neither the holding nor the reasoning in Cooper undermines our conclusion that the guidelines are applicable in cases involving adult children.
[12] We also observe that, in connection with James's motion for reconsideration, James submitted evidence that the affected real property was worth $440,000, indicating that the security order actually touched approximately one-half his assets.
[13] With respect to such requests, Family Code section 2031 provides that a party may apply for a temporary award of attorney fees "without notice by an oral motion in open court ... [a]t the time of the hearing of the cause on the merits." (Fam. Code, § 2031, subd. (b)(1).)
[14] Family Code section 271 provides in part: "Notwithstanding any other provision of this code, the court may base an award of attorney's fees and costs on the extent to which the conduct of each party or attorney furthers or frustrates the policy of the law to promote settlement of litigation and, where possible, to reduce the cost of litigation by encouraging cooperation between the parties and attorneys. An award of attorney's fees and costs pursuant to this section is in the nature of a sanction."